COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 02-09-00212-CR

BETTY SUE BRANSON APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

In seven points, Appellant Betty Sue Branson appeals her convictions for attempted capital murder and arson.  We affirm the trial court’s judgment as modified.

II.  Factual and Procedural Background

Branson was charged with the attempted capital murder of her boyfriend, George (“Buddy”) Svec, with a deadly weapon (combustible or flammable liquid) through the commission of arson, and with committing arson with a deadly weapon (gasoline) on or about August 24, 2008.  The jury convicted her of both crimes, found both deadly-weapon allegations true, and sentenced her to twelve years’ confinement for each conviction, to be served concurrently.  Because Branson challenges the sufficiency of the evidence to support her convictions, we will address the evidence in greater detail below.

III.  Double Jeopardy

In her first point, Branson complains that she was denied Double Jeopardy protection because she was convicted and punished for arson in both counts.
(footnote: 2)  The State concedes that Branson was denied her constitutional protections against Double Jeopardy and requests that this court modify the trial court’s judgment setting out Branson’s conviction for arson and affirm only the trial court’s judgment of conviction and sentence for the offense of attempted capital murder.

A.  Standard of Review

The Double Jeopardy Clause of the United States Constitution provides that no person shall be subjected to twice having life or limb in jeopardy for the same offense.  U.S. Const. amend. V.  Generally, this clause protects against multiple punishments for the same offense.  
Brown v. Ohio
, 432 U.S. 161, 165, 97 S. Ct. 2221, 2225 (1977); 
Ex parte Cavazos
, 203 S.W.3d 333, 336 (Tex. Crim. App. 2006).
  To determine whether both offenses are the same, we must examine the elements of the applicable statutes to determine whether each statute “requires proof of an additional fact which the other does not.”  
Blockburger v. United States
, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932); 
see United States v. Dixon
, 509 U.S. 688, 696, 113 S. Ct. 2849, 2856 (1993); 
Parrish v. State
, 869 S.W.2d 352, 353–55 (Tex. Crim. App. 1994).  When resolving whether two offenses are the same for double jeopardy purposes, we focus on the elements alleged in the charging instrument.  
Bigon v. State
, 252 S.W.3d 360, 370 (Tex. Crim. App. 2008). 
 
The general rule is that greater inclusive and lesser included offenses are the same for double jeopardy purposes. 
Parrish
, 869 S.W.2d at 354.  
When a defendant has been prosecuted and convicted in a single criminal action of two or more offenses that constitute the same offense, in violation of double jeopardy, and both offenses carry the same punishment, the appellate court may strike either conviction.  
See Martinez v. State
, 225 S.W.3d 550, 555 (Tex. Crim. App. 2007).

B.  Analysis

The court’s charge tracked the two counts of the indictment.  Count one charged that on or about August 24, 2008, Branson 

did then and there, with the specific intent to commit the offense of capital murder of George Svec, intentionally ignite a combustible or flammable liquid with an open flame 
during the course of committing or attempting to commit arson 
which amounted to more than mere preparation that tended but failed to effect the commission of the offense intended[.]  [Emphasis added.]

Count two charged that on or about August 24, 2008, Branson 

did then and there intentionally start a fire or cause an explosion by igniting a combustible or flammable liquid with an open flame or other ignition source, with the intent to damage or destroy a habitation, knowing said habitation was within the limits of an incorporated city or town, and bodily injury was suffered by George Svec by reason of the commission of said arson[.]

As the jury convicted Branson of both counts, it is readily apparent that it convicted her of attempted capital murder, with arson as the underlying predicate offense, and of arson causing bodily injury, thereby violating her double-jeopardy protection.  
See
 Tex. Penal Code Ann. § 19.03(a)(2) (Vernon 2008) (stating that a person commits capital murder if he intentionally commits murder in the course of committing or attempting to commit arson, among other acts); 
see also Littrell v. State
, 271 S.W.3d 273, 276, 279 (Tex. Crim. App. 2008) (holding that appellant’s double-jeopardy rights were violated when the trial court authorized the jury to convict and punish him for both felony murder and the aggravated robbery upon which the felony-murder charge was predicated). 
 Therefore, we sustain Branson’s first point, set aside her arson conviction and sentence, and reform the trial court’s judgment to reflect only her conviction for attempted capital murder.
(footnote: 3)  
See
 
Martinez
, 225 S.W.3d at 555. 

IV.  Sufficiency of the Evidence

In her second point, Branson challenges the sufficiency of the evidence to establish that she acted with the specific intent to commit the capital murder of Buddy.  We will review the evidence only under the legal sufficiency standard because the court of criminal appeals has recently overruled 
Clewis
 
v. State
, 922 S.W.2d 126 (Tex. Crim. App. 1996) (setting out the factual sufficiency standard of review) and decided “that the 
Jackson v. Virginia 
legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt.”  
Brooks v. State
, No. PD-0210-09, 2010 WL 3894613, at *1, 14 (Tex. Crim. App. Oct. 6, 2010).

A.  Legal Sufficiency
 
Standard of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Clayton v. State
, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). 

B.  
Attempted Capital Murder

The 
attempted-capital-murder-by-arson charge required the jury to find that Branson, with the specific intent to commit the capital murder of Buddy, intentionally ignited a combustible or flammable liquid with an open flame during the course of committing or attempting to commit arson, which act amounted to more than mere preparation that tended but failed to effect the commission of capital murder.  
See
 
Tex. Penal Code Ann. §§ 15.01 (Vernon 2003) (defining criminal attempt), 19.03 (Vernon 2003) (defining capital murder)
;
 Hardy v. State
, 281 S.W.3d 414, 421 (Tex. Crim. App. 2009) (stating that the 
sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case, not the charge actually given).
  A person commits arson if she starts a fire with intent to destroy or damage any building or habitation, knowing that it is within the limits of an incorporated city or town, and bodily injury or death was suffered by any person by reason of the commission of the offense or the property intended to be damaged or destroyed by the actor was a habitation.  
See
 Tex. Penal Code Ann. 
§ 28.02(a)(2)(A), (d) (Vernon 2003) (defining first degree felony arson).

C.  Evidence

1.  The State’s Case

Branson lived in a mobile home park in Haltom City next to Cheryl Dalton and across from Dalton’s daughter Heather.  Betty and Lloyd Bright, Mark and Brenda Phillips, Karen Long, and Branson’s mother all lived on the same street.  Buddy lived with Branson and her chihuahuas, Jack and Chrissy.

Cheryl and two of her daughters, Stormi (age twenty-four) and Jamey Jo (age twenty-nine), testified at trial.  On the morning of August 24, 2008, Jamey Jo and Cheryl were leaving their home when they saw Branson and Buddy working in Branson’s yard.  Buddy gave Jamey Jo some cash to buy him some cigarettes. Cheryl said that Branson looked aggravated with Buddy for talking to Jamey Jo.

Branson, a medical assistant, went to work later that day.  Jamey Jo saw Branson when Branson came home from work, and she heard Branson talking loudly as she unloaded dirt from her truck.  Specifically, she heard Branson say she was “really pissed off” because Buddy had not finished the yard.  Cheryl testified that she asked Branson whether she got her flowers planted, and Branson replied, “No, I fucking didn’t.”  Branson returned shortly thereafter, apologized for being rude and, according to Jamey Jo, said, “I’m sorry.  It’s not y’all; it’s him,” and, according to Cheryl, “I’m not mad at you, I’m mad at him.” 

Later that evening, Stormi and Jamey Jo were home watching a movie when they heard banging outside and their dog started “going crazy,” barking loudly. When they opened their front door, which faced Branson’s trailer, they smelled and saw smoke and saw Branson in her nightgown, beating on her trailer’s back door with something and screaming about her dogs being inside.  Stormi and Jamey Jo went back inside their trailer, woke Cheryl, and told her that they thought Branson’s house was on fire.  Cheryl called 911.  From her front porch, Cheryl could see and smell smoke.  She asked Branson what was going on, and Branson replied, “My house is on fire.”  She asked Branson where Buddy was, and Branson replied, “He’s in the fucking house, and I hope he dies.  I hope the son of a bitch dies.”
(footnote: 4)
 Branson’s trailer’s metal front door was open, but the screen door was closed, and Jamey Jo could not see inside.  She ran to her father’s truck, got a tire iron, ran back to Branson’s trailer, and broke the front window.  She saw Buddy on the floor, not moving, and flames inside the residence on the main wall, as well as a lot of smoke.  Jamey Jo yelled for Buddy, but he did not move.

Lloyd Bright testified that he and his wife Betty had gone to bed when their dog started barking.  He went to see what was going on and saw a couple of people screaming and running around between the Daltons’ trailer and Branson’s.  When he and his wife went outside, they could hear fire engine sirens. 

Haltom City Fire Department Lieutenant Greg Wagner testified that he was the first officer on the scene that night.  He saw moderate smoke coming from the trailer’s front door, and two women told him that there were three dogs in the trailer that needed to be rescued—the woman he identified as Branson was “very hysterical.”  He asked both women if anybody else was inside, but they did not respond.  Firefighter Phillip Perdue, who was dressed in full gear and carrying the fire hose, stated that he was detained by two women who tried to stand in his way. They did not move when he told them to.
(footnote: 5)  Lieutenant Wagner and Branson were exchanging words
(footnote: 6) when he heard Firefighter Perdue say, “We found a victim.” Firefighter Perdue rescued Buddy.

Firefighter Perdue described the interior as having visibility of two feet and being “really, really hot,” and he described Buddy as unconscious and spitting up when he found him.  While rescuing Buddy, he became tangled with a coffee table that was between Buddy’s location on the floor and the front door.  When he brought Buddy out, a female yelled, “Why didn’t you leave him in there?”

By the time Lieutenant Wagner went inside the trailer, there was very little active flame and the north side wall was blackened.  He did not know if the walls were actually on fire.  There appeared to have been some fire suppression activities prior to the firefighters’ arrival, including a garden hose through the front door that was still flowing.

Buddy and three dogs were treated with oxygen.  Firefighter Sterling Gilliland testified that when he started treating Buddy, Buddy had a copious amount of mucus present in his mouth and airway and soot from the fire around his nose and mouth, which made him think that Buddy had smoke inhalation or airway injuries.  When Buddy regained a semiconscious state, his breathing was irregular, labored, and rapid, and he fell into respiratory arrest for around a minute before beginning to breathe on his own again. 

Paramedic Jennifer Craven, who arrived with the Medstar ambulance that night, stated that Firefighter Gilliland told her that Buddy was “found unconscious in his house, had to be carried out, wasn’t breathing appropriately when they found him, and they had to assist his breathing until he became conscious again.”  Buddy was conscious when she spoke with him and had no obvious burns, but his moustache was singed, and she could smell burnt hair.  The saliva on his face had soot in it, which indicated to her that smoke had been deep in his lungs, and she was concerned about the possibility that he had airway burns and swelling.  He initially objected to being taken to any hospital and would only let her take him to the closest, North Hills Hospital.
(footnote: 7)
 While Lloyd and Betty Bright stood in their driveway, Branson walked over and sat down on the curb.  Branson screamed for a cigarette, and Cheryl gave her one, hoping it would calm her down.  Lloyd described Branson as “pretty angry and flailing her arms.  She kept asking—just saying the same things about her dogs.”  Betty asked Branson who started the fire, and Branson replied, “I did.  I wanted him dead, but I’ve killed my dogs.  I’ve killed my dogs.  I’ve killed my dogs.”
(footnote: 8)  The chihuahuas, Jack and Chrissy, as well as Ladybug, Branson’s mother’s dog, were in Branson’s trailer on the evening of August 24, 2008, and all three dogs died that night. 

Haltom City Police Officer Brandon St. John testified that he spoke with Buddy, Betty Bright, Mary Cole, and Branson that evening.  Lloyd stated that when Officer St. John came over to the Brights’ driveway and told Branson about her dogs, she went into a tirade.  Officer St. John described Branson as 

very hysterical on [the] scene, very uncooperative.  During the investigation, when I was speaking to her, it was very hard to talk to her.  She kept referring to her dogs, asking about her dogs, during the course of me trying to gather information from her about what happened during the incident. 

When he told Branson that she was not free to leave the scene, she stood up from the curb and began to walk off.

Officer St. John drew his taser, and Branson told him to go ahead and shoot her.  When he armed the taser, she lifted up her nightgown, exposing herself.
(footnote: 9)  Officer St. John said that he did not have to use the taser on her and that he eventually calmed her down enough to arrest her based on the information he had gathered at the scene.

Jamey Jo said that Branson urinated on herself in the Brights’ driveway.  She described Branson as “going crazy over there, cussing . . . screaming a lot of stuff out,” like that “[s]he didn’t mean to kill her dogs, she wanted to kill Buddy, and she wanted to kill us and then herself.  She didn’t like us because everybody was talking about her and we’re supposed to be her friends.”
(footnote: 10)
 Haltom City Fire Department Deputy Chief Charles Napp, a fire marshal and master arson investigator, testified that what Captain Chilcutt described to him about the activities at the scene “more or less raised a red flag for [them] to look for certain things at the house.”  He said that there was very little structural damage and that it looked like there was more than one fire.  He called for a dog and handler from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), took photos, and took samples from where the dog “hit.”
(footnote: 11)  Chief Napp’s samples included portions of the carpet and the coffee table; he also collected a foam pillow that was on the floor and an orange cigarette lighter.

Chief Napp found what he thought was a plastic gas can that had melted, and he stated that based on the evidence at the scene, the samples, and witness statements, he eliminated electrical causes and storms as the fire’s cause.  Because he did not find evidence of a smoldering cigarette in the sofa, which would also not have accounted for the fire in the middle of the floor, the evidence “began to point to an intentionally set fire.”  Chief Napp described the three types of fire in the fire industry:  arson, accidental, and undetermined, and he gave his opinion that this fire was not accidental or undetermined.  A representative from the State Fire Marshal’s Laboratory in Austin testified that he tested Chief Napp’s samples and that gasoline was found on the foam pillow, the coffee table sample, the suspected gas can, and the carpet.

Buddy testified that he had known Branson for a year or two and that she let him move in with her.  When Branson came home from work on August 24, she started drinking and went through a couple of bottles of white zinfandel.
  Branson was also taking Xanax. Buddy asked Branson’s mother to come over and calm her down.

Branson broke some items in the house that night and then went outside and retrieved the red and black gas can that they used for the lawn mower and the weed eater.  It was less than half full of gasoline.  Branson turned the coffee table upside down and poured gasoline onto it.  She kneeled down and used a lighter to light the fire, which spread to the carpet.  Buddy opined that Branson was not trying to commit suicide. 

Buddy and Branson were the only people in the trailer when it caught on fire.  He tried to get her up from where she knelt and then went to get her mother.  He also retrieved the fire extinguisher from the kitchen—he had to go through the fire to get it—but it ran out of foam.  Buddy went outside, found the garden hose, and tried to put the fire out with it.  He also tried to reach the dogs but was unable to get to them.

Buddy recalled being removed from the house and his treatment by the firefighters and paramedics, but he did not remember the ride to the hospital.  He woke up in intensive care in the Parkland Burn Unit in Dallas, where he was told that his lungs “got a little burnt and stuff” and one of his tonsils was “messed up” and required surgery.  He also testified that the fire melted his feet a bit.  Parkland discharged Buddy the evening after the fire.

Buddy had been arrested prior to testifying.  He admitted that he had told Branson’s counsel the night before his testimony that “whoever gets me out [of jail] gets my vote,” but he added, “I am certainly not going to lie to get out of jail.”

Lieutenant Wagner, Captain Chilcutt, and Chief Napp testified that gasoline, if used to start a fire, is capable of causing death or serious bodily injury; Lieutenant Wagner added that a combustible or flammable liquid could do the same.  Chief Napp testified that Haltom City was incorporated in 1960. 

2.  The Defense’s Case

Dr. Jerry Davis, Branson’s former employer, testified that Branson seemed very sad and distraught during the day on August 24, 2008, and she told him that she was feeling very sad and just wanted to run away from it all.  He described the symptoms of major depression, stated that his assessment was that Branson had been suffering from a severe major depression, and stated that he had been in communication at the time with Branson’s other doctors, including her treating psychiatrist.

Karen Long testified that Branson lived across from her and that on the night of the fire, Branson ran across the street, said her house was on fire, and asked Karen to call 911.  Karen saw smoke and called 911.  She asked Branson where the dogs were, and Branson said that they were not in their cages.  Karen said, “I’m going after them,” and headed to Branson’s house. 

Karen saw Buddy shaking the front door, trying to get in.  He managed to get it open.  Mary Cole, Branson’s mother, joined Karen on the porch.  Buddy had the hose and Mary helped him, trying to put the fire out.  Karen tried to get in to get the dogs but was unable to because of the smoke.  One of the firefighters asked Karen, “Is anybody in there?”  She replied, “Sir, please get the dogs, but I don’t think anybody’s in there,” because she thought Buddy was with them when they left the porch.  She realized she was wrong when she saw them bring Buddy out.

Karen went home after she saw police handcuff Branson and put her in a police car.  She saw Buddy two days later, and he asked her if he could move in with her.  Karen stated that when Buddy asked if he could move in with her, he told her that he threw a cigarette into the gas and lit it.

Karen described Buddy as “a liar, con man, thief,” and Cheryl Dalton as “a liar.”  Karen stated that Branson and Cheryl had been really good friends, but in the May or June before the fire, things began to get unfriendly, and the Daltons “aggravated [Branson] and stood out there in that yard and harassed her and screamed at her so much, it was just unreal, what they did.”
(footnote: 12)
D.  Analysis

Branson complains that the attempted capital murder conviction 
required the jury to find a specific intent to kill, not to harm, and that the evidence does not show that she acted with the specific intent to kill Buddy.  
She also argues that there is no evidence that she knew Buddy was inside the burning trailer and that her bizarre behavior was consistent with being suicidal.  She concedes that “there is no question but that [she] started the fire, that damage was done, that the habitation was within an incorporated city[, and t]here is no question but that bodily injury [w]as suffered by the injured party.”
(footnote: 13)
 Although Branson argues that “[t]here is absolutely no evidence to contradict [her] belief that she did not know where Buddy was,” or of her specific intent to kill him, the record is replete with evidence of both Branson’s specific intent to cause Buddy’s death and her knowledge of his whereabouts during the fire.  Cheryl testified that Branson said Buddy was in the burning trailer and that she hoped he died. Betty Bright testified that Branson admitted to starting the fire and that she wanted Buddy dead but had killed her dogs instead.  Lloyd, Jamey Jo, and Stormi testified that they each heard Branson state variations of this.  Viewed in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found that Branson knew where Buddy was and that she had the specific intent to cause his death. 

Furthermore, notwithstanding the testimonies of Cheryl, Jamey Jo, Stormi, and Lloyd and Betty Bright about Branson’s statements that Buddy was in the burning trailer and that she hoped he died and wanted him dead, there was additional evidence for the jury to consider in determining Branson’s culpability. Buddy described Branson’s drinking a couple of bottles of wine that night before she turned the coffee table upside down, poured gasoline on it, and lit the gasoline, and he opined that Branson was not trying to commit suicide when she did this.  In contrast, Dr. Davis testified that Branson had been severely depressed at work on the day of the fire, and Jamey Jo testified that Branson said she wanted to kill not just Buddy but “us” (meaning at least the Daltons) and then kill herself.  Karen testified that Buddy and Cheryl were liars, that Buddy told her he lit the fire, and that she thought Buddy was outside until she saw the firefighters bring him out of the burning building.  Buddy admitted that he had said that 
“whoever gets me out [of jail] gets my vote,” but he also stated that he would not lie to get out of jail.  
Emergency personnel described Branson as hysterical about her dogs but noted that she failed to mention that a person might still be inside the burning trailer, and Firefighter Perdue testified that two women detained him and tried to stand in his way when he attempted to enter the trailer. 

The jury had to determine the weight and credibility of the testimonies by Branson’s neighbors, the emergency responders, Buddy, Branson’s friend Karen, and Branson’s former employer, Dr. Davis, and it did so. 
 See
 
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); 
Brown v. State
, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008) (stating that the jury is the exclusive judge of the credibility of the witnesses and the weight to be given their testimonies), 
cert. denied
, 129 S. Ct. 2075 (2009). 
 Viewed in the light most favorable to the prosecution, we conclude that the jury could have found the essential elements of the crime beyond a reasonable doubt.  
See
 
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789; 
Clayton
, 235 S.W.3d at 778.
  Therefore, we hold that the evidence is legally sufficient to convict Branson of attempted capital murder by arson, and we overrule Branson’s second point.

V.  Jury Argument

In her fourth and fifth points, Branson argues that the trial court erred by denying her motion for mistrial because the prosecutor made improper and prejudicial remarks during the State’s punishment phase closing arguments.

A.  Standard of Review

To be permissible, the State’s jury argument must fall within one of the following four general areas:  (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or (4) plea for law enforcement. 
 Felder v. State
, 848 S.W.2d 85, 94–
95 (Tex. Crim. App. 1992), 
cert. denied
, 510 U.S. 829 (1993); 
Alejandro v. State
, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973).

When a trial court sustains an objection and instructs the jury to disregard but denies a defendant’s motion for a mistrial, the issue is whether the trial court abused its discretion in denying the mistrial.  
Hawkins v. State
, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004).  Only in extreme circumstances, when the prejudice caused by the improper argument is incurable, i.e., “so prejudicial that expenditure of further time and expense would be wasteful and futile,” will a mistrial be required.  
Id.; see also Simpson v. State,
 119 S.W.3d 262, 272 (Tex. Crim. App. 2003), 
cert. denied,
 542 U.S. 905 (2004).  
In determining whether a trial court abused its discretion by denying a mistrial, we balance three factors:  (1) the severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of the punishment assessed absent the misconduct.  
Hawkins,
 135 S.W.3d at 77; 
Mosley v. State
, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh’g), 
cert. denied
, 526 U.S. 1070 (1999).

B.  Prosecutor’s Remarks

Branson complains about these portions of the State’s closing argument:

[Prosecutor]:  . . . Take the priors back and take a look at them. Every boyfriend she chooses, husband, there’s fights.  She’s now here today before you with 
two
 convictions for tuning up boyfriends.  One physically back a couple of years ago.  This one by pouring out gas[oline] and lighting his lungs on fire.  [Emphasis added.]

[Defense Counsel]: Your Honor, I’m going to object.  There are no convictions at all.

The Court: Sustained.

[Defense Counsel]: Ask the jury to disregard.

The Court: Jury will disregard last statement of counsel.

[Defense Counsel]: Ask for mistrial. 

The Court: Denied. 

. . . .

[Prosecutor]:  You have to stand before a judge and say, “Are you guilty or not guilty?”  And you have to own up to it.  And the judge holds that guilty verdict in abeyance for you to serve out your conditions of probation.  Yes, she has done that.  She has done that time and time again, and she hasn’t learned her lesson.

. . . .

[Prosecutor]:  [Defense counsel] has hired [Dr.] Price in the past. [Defense counsel] provided the district attorney’s office with all the medical records that were obtained under subpoena.   [Defense counsel] had the ability to bring in Dr. Kumar Reddy here to testify. He had a chance to bring in the folks from Millwood and Springwood where Dr. Price, back in 2001, in reading the records, talked to you about the character flaw.  It’s not a mental disease; it’s a character flaw where the prognosis is poor.

What [Defense counsel] can find, scrambling on his laptop here in the courtroom, that’s something the University of Washington has done is one thing— 

[Defense Counsel]: Your Honor, I’m going to object to [the] district attorney striking at client through counsel.

The Court: Sustained.

[Defense Counsel]:  Ask to instruct the jury.

The Court: The jury will disregard the last statement of counsel.

[Defense Counsel]:  And I’m going to ask for a mistrial.

The Court: Denied.

C.  Analysis

Branson combines her discussion of her fourth and fifth points.  She complains that the prosecutor’s misstatement that she had two convictions and his attack on “the lawful and proper actions of her counsel in advancing relevant evidence” harmed her because the jury must have rejected probation “based in large part upon the prosecutor’s argument as to [Branson’s] character as submitted to them in argument.”

With regard to the prosecutor’s remark about two convictions, we note that the punishment phase evidence showed that Branson had pleaded guilty to and been placed on deferred adjudication for possession of a controlled substance (1998), burglary of a habitation (1998), and misdemeanor assault-“threat/contact” (2000), which were all dismissed upon successful completion of community supervision, and that she had also been convicted of DWI (2004).  Therefore, the prosecutor erred by telling the jury that she had 
two
 convictions for “tuning up boyfriends.”   

However, with reference to the 2000 assault case, the prosecutor had previously explained to the jury when he entered the exhibits of Branson’s judgments and sentences in evidence, “When I said ‘convicted,’ she pled guilty to it.  A conviction is not final on deferred. . . .  It’s a six-month plea of guilty.  She served out the six months.  The charge goes away on deferred adjudication as part of the stipulation between the State and defense.”  The prosecutor explained both before closing arguments and immediately after Branson’s counsel objected to his remark that, while Branson had pleaded guilty to assault, she had successfully completed her deferred adjudication and that conviction had “go[ne] away.”  And the jury had just convicted Branson of the charges against her in the instant case, resulting in 
one
 conviction involving harm to a boyfriend and 
one
 plea of guilty to assault of another.  We think, in light of the prosecutor’s explanations before and during closing arguments, that the misconduct here was not severe.  

Additionally, with respect to the curative measures taken, the trial court correctly sustained the objection to the “two-conviction” statement and instructed the jury to disregard it.  And considering Branson’s previous criminal history, the nature of this offense, the evidence presented to the jury that she started the fire and wanted Buddy to die, and the fact that the jury assessed only twelve years’ confinement—the lower end of the five-to-ninety-nine or life range—we conclude that there is certainty in the punishment assessed even without the misconduct. Therefore, the trial court did not err by denying her motion for mistrial, and we overrule Branson’s fourth point.  
See Hawkins
, 135 S.W.3d at 76–77; 
see
 
also Young v. State
, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004) (explaining that an instruction to disregard and a mistrial are corrective measures; an instruction attempts to cure harm, while a mistrial is reserved for cases in which an instruction could not cure harm, leaving the jury in an unacceptable state to continue the trial).

With regard to the prosecutor’s second remark, the State called Dr. Price as a rebuttal witness during the punishment phase.  He opined that, based on his review of Branson’s medical records, Branson’s behavior on August 24 was not suicidal and that her records indicated that she had a possible borderline personality disorder.  He explained that a personality disorder is a character trait, not a mental illness like schizophrenia and depression, and that it is often referred to as unstable or unpredictable personality disorder and includes “certain extreme, unpredictable kind[s] of behaviors that cause other people a lot of grief and distress as well,” such as inappropriate or intense anger.  He testified that borderline personality disorder had no effective treatment, that Branson’s behavior was consistent with borderline personality disorder, and that borderline personality disorder can present a danger to others and to the person with the disorder.

On cross-examination, defense counsel elicited information from Dr. Price about Dr. Price having worked for him before and that Branson had been seen by Dr. Reddy until about two weeks before the fire.  He asked Dr. Price about whether he could determine from Branson’s medical records whether there was a trusting relationship between Dr. Reddy and Branson.  Dr. Price stated that other than the fact that nothing in Dr. Reddy’s records of Branson’s treatment noted that there was a problem with lack of trust, he had no idea if there was a trust problem.  Dr. Price admitted that he did not know Dr. Reddy or his reputation. 

Defense counsel also inquired whether Dr. Price was familiar with “dialectical behavior therapy” developed at the University of Wyoming as a treatment plan for borderline personality disorder.  Dr. Price responded that he was not familiar with the therapy and that articles on treatment for the disorder consistently indicated a poor prognosis.  Defense counsel did not introduce any evidence in support of the dialectical behavior therapy.  During closing arguments, and prior to the State’s remark at issue here, defense counsel made the following statements:

Yes, it is true, the district attorney brought a psychologist.  They brought you a psychologist that I had used myself to talk to you and tell you what possibly may be wrong with her.  What we know is wrong with her is that she suffers from depression, is that she was being treated by a psychiatrist and prescribed medications.  [Dr. Price] doesn’t know about certain therapies for border line personality disorders.  Maybe now he’ll know.

Striking at a defendant over defense counsel’s shoulders is impermissible. 
Wilson v. State
, 938 S.W.2d 57, 62 (Tex. Crim. App. 1996), 
abrogated on other grounds by Motilla v. State
, 78 S.W.3d 352 (Tex. Crim. App. 2002)
. 
However, the State’s argument about Dr. Price and the University of Washington research was proper in that it answered the argument of opposing counsel.  
See Felder
, 848 S.W.2d 94–95.  

Furthermore, although it is not good practice, 
pointing out to the jury that no one testified favorably for the defendant may be allowed.  
See Mosley
, 686 S.W.2d at 183–84; 
accord McKenzie v. State
, 617 S.W.2d 211, 219–20 (Tex. Crim. App. 1981). 
 Because defense counsel brought out in his cross-examination of Dr. Price that Dr. Price did not know or know of Dr. Reddy outside of Dr. Reddy’s medical records on Branson, the prosecutor could point out that defense counsel could have brought Dr. Reddy, or Branson’s other doctors, to testify about whether Branson had a mental disease or a character flaw.  Under these circumstances, the trial court did not have to sustain the objection, instruct the jury to disregard the statement, or grant a mistrial.  We overrule Branson’s fifth point. 

VI.  Voir Dire

In her sixth point, Branson claims that the trial court erred by denying her challenges for cause to prospective jurors because they placed the burden of proof upon Branson to establish her innocence.  In her seventh point, she argues that the trial court erred by denying her request for additional peremptory challenges.

Branson complains that she challenged for cause the following veniremembers because they “expressed that the Appellant must prove her innocence and thus were unable to follow the law as to the burden of proof”:  Gilbert (#5), Eyler (#8), Silvia (#28), Bucknor (#29), Nelson (#32), Avery (#44), Saucillo (#53), Williamson (#59), and Harlow (#60).
(footnote: 14)
 The trial court struck twelve members of the venire for cause, including Gilbert (#5), Bucknor (#29), Saucillo (#53), and Harlow (#60).  In response to Branson’s burden-of-proof argument on the jurors she challenged for cause, the trial court replied, 

That’s not what I heard as to all of them.  They said they’d like to see you prove his [sic] innocence; however, there’s no explanation how that would affect their ability to follow the presumption of innocence in this trial or how that would affect their ability to follow any other law or rule that would be applied to them.

After his challenges for cause were denied, Branson’s counsel stated,

Defense is requesting four additional strikes because we would be required to use our peremptory challenges on—to get rid of jurors that we believe are placing the burden of proof on the defense and, without additional challenges for cause, we’ll be forced to have unqualified jurors on the jury.

He did not identify who these unqualified jurors would be, and the trial court denied his request.  Branson exercised her peremptory strikes on the following members of the venire:  #4, #7, #8 (Eyler), #11, #19, #20, #28 (Silvia), #32 (Nelson), #36, and #39.  Only veniremembers #8, #20, #28, and #32 were in the group of nine who made the controversial statement.
(footnote: 15)
 To preserve error regarding a trial court’s denial of a challenge for cause, a defendant must:  (1) exercise a peremptory challenge on a venire member whom the trial court should have excused for cause; (2) exhaust all of his peremptory challenges; (3) request and be denied an additional peremptory challenge; (4) identify the objectionable venire member 
who actually sat on the jury 
whom he would have struck otherwise; and (5) make the trial court aware of his complaint at a time and in a manner in which it could be corrected. 
Loredo v. State
, 159 S.W.3d 920, 923 (Tex. Crim. App. 2004); 
see Johnson v. State
, 43 S.W.3d 1, 5–6 (Tex. Crim. App. 2001); 
see also 
Tex. R. App. P. 33.1.  Further, an appellant challenging denials of challenges for cause is entitled to appellate review of denials only with respect to jurors he used statutory peremptory strikes to exclude.  
Busby v. State
, 253 S.W.3d 661, 671 (Tex. Crim. App.), 
cert. denied
, 129 S. Ct. 625 (2008).  If the issue has been preserved, the appropriate standard of review for the denial of a challenge for cause is an abuse of discretion standard.  
Curry v. State
, 910 S.W.2d 490, 493 (Tex. Crim. App. 1995).  

Branson has failed to preserve her complaint for our review because, in addition to not using all of her peremptory strikes on jurors that she challenged for cause, she failed to identify to the trial court (or to this court) an objectionable veniremember who actually sat on the jury and who she would have otherwise struck had the trial court not denied her challenges for cause or her requests for additional peremptory strikes.  
See Loredo
, 159 S.W.3d at 923.  That is, of the veniremembers Branson complains of on appeal, she used peremptory strikes on Eyler (
#8), Silvia (#28), and Nelson (#32), but not on Avery (#44) and Williamson (#59), who were not otherwise selected to sit on the jury.
(footnote: 16)  
See id.
  And the trial court struck 
Gilbert (#5), Bucknor (#29), Saucillo (#53), and Harlow (#60) for cause.
(footnote: 17)  We overrule Branson’s sixth and seventh points.

VII.  Conclusion

Having sustained Branson’s first point and overruled her second through seventh points, we modify the trial court’s judgment to vacate the conviction and sentence for arson and to reflect only the conviction and sentence for attempted capital murder.  We affirm the trial court’s judgment as modified.

PER CURIAM

PANEL:  MCCOY, GARDNER, and WALKER, JJ.

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

DELIVERED: November 4, 2010

FOOTNOTES
1:
See
 Tex. R. App. P. 47.4.

2:
That is, she argues that “the Arson in Count 2 was but a lesser included offense of Count 1,” and that the manner and means of the arson in both counts is identical, as is the time and victim.

3:
Based on our resolution here of count two of the indictment (arson), we need not address Branson’s third point, in which she complains that the evidence is insufficient to establish in count 2 that she “knew or intended that by such arson that the injured party would suffer such bodily injury.”  
See
 Tex. R. App. P. 47.1.

4:
Stormi testified that she heard Branson say, in response to Cheryl’s question about where Buddy was, that she did not care where Buddy was, that “she wanted that SOB dead,” and that she had to get inside to find her dogs.  Jamey Jo testified that Branson told Cheryl that Buddy was still inside and that she “wishe[d] the son of a bitch would die.”

5:
Haltom City Fire Department Captain David Chilcutt testified that he saw Engineer Hudson physically remove a woman from the scene and that he found out later that she was upset because the fire department would not let her go back into the trailer to find her animals.

6:
Lieutenant Wagner testified about the following exchange with Branson:

When I told her to get out of the way, she advised me that we don’t know how to do our F–ing job.  I told her, I said, “Ma’am, you need to step out of the way.  Let us do our job.”  And as I went through the gate up the steps, she said she’d go in and get [the dogs] herself.  I turned around and advised her, “You’re not going inside.  You need to stay back.”

7:
North Hills Hospital subsequently transferred Buddy to Parkland Hospital in Dallas. 

8:
Lloyd stated that he heard Branson say, “I started the fire.  I wanted him dead.”  Branson did not say who she wanted dead.

9:
Lloyd stated that Branson flashed everyone in response to the officer’s question about whether she had any weapons and that the officer did not pull out his taser until she flashed him.

10:
Cheryl described  Branson as “going wild,” and testified that Branson said she was going to get them, pointing at Brenda Phillips’s house and Betty and Lloyd Brights’ house.  Cheryl asked her, “What do you mean you’re going to get?” Branson replied, “All you do is talk about us,” and “I’m going to get y’all.  I was going to get y’all.” 

11:
Bedford Fire Department Lieutenant Joey Lankford (cross-designated as ATF Special Agent Lankford) and canine Rio performed a demonstration for the jury of how Rio detects accelerants.

12:
Testimony during the State’s case revealed that during the last year that they lived next to each other, Branson and Cheryl had not been on speaking terms.  But in the weeks leading up to the fire on August 24, 2008, their relationship improved, and Branson told Cheryl that Buddy had been stealing electricity from the Daltons. Cheryl called the police about this theft less than three weeks before the fire.
 

13:
Additionally, there is legally sufficient evidence, as set out above, to support each of these elements. 

14:
Each of these agreed, in response to Branson’s counsel’s question, “What do I have to do during this trial?” that he needed to prove his client’s innocence. Following those statements, however, Branson’s counsel responded, 

Okay.  All right.  I ain’t got to do nothing. . . .  I can sit in this chair right here, except it will be right here, and do absolutely nothing the entire time, and I have done my job.  I get paid a lot of money to do nothing. You think I’m going to do that?

The venirepanel responded, “No.”  He then continued, “Okay.  I don’t have to call witnesses.  I don’t have to question anyone.  I don’t have to say anything.  Who really thinks I’m going to not say something?  I don’t have to present innocence.  Is this fair?”  The venirepanel responded, “Yes.”

15:
Veniremembers #19 and #39 were in law enforcement, #11 had travel plans, and #36 suffered from back pain.  We cannot tell from the record why defense counsel might have struck veniremembers #4 and #7.

16:
Furthermore, even if she had preserved error, she would only be entitled to appellate review of her challenges to Eyler (#8), Silvia (#28), and Nelson (#32), because these are the jurors she used statutory peremptory strikes to exclude.  
See Busby
, 253 S.W.3d at 671. 

17:
We also cannot see how Branson could have been harmed, since none of the veniremembers she complains of on appeal were 
seated as jurors.